# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 16, 2003 Session

## STATE OF TENNESSEE v. JAMA ELAINE PENLEY

**Direct Appeal from the Criminal Court for Greene County**
**No. 01CR043A     James E. Beckner, Judge**

---

**No. E2003-00820-CCA-R3-CD**
**May 11, 2004**

---

The appellant, Jama Elaine Penley, was convicted by a Greene County jury of facilitation of first degree premeditated murder, a Class A felony. Following a sentencing hearing, the trial court sentenced the appellant as a Range I standard offender to twenty-five years in the Tennessee Department of Correction. On appeal, the appellant challenges the denial of her motion for judgment of acquittal and the sentence imposed by the trial court. Upon review of the record and the parties' briefs, we remand to correct a clerical error in the judgment but otherwise affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed as Modified.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Francis X. Santore, Sr., and Francis X. Santore, Jr., Greeneville, Tennessee, for the appellant, Jama Elaine Penley.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Eric Christiansen and Cecil Mills, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

On January 4, 2001, the victim, Michael Cunniff, was murdered and his body placed in the rear of a van, which was doused with gasoline and set on fire. In December 2001, a Greene County Grand Jury issued presentments, charging the appellant, Kermit Penley, and Angela Cunniff with

the victim's murder.[1] The appellant pled not guilty and proceeded to trial on one count of first degree premeditated murder and two counts of first degree felony murder.

At trial, Jim Ellison, a detective with the Greene County Sheriff's Department, testified that on January 4, 2001, he was assigned to investigate a "burned out" van discovered at Insurance Hole on Greene Mountain Road in Greene County. A burned body, later identified as the victim, had been discovered in the rear of the van. When Detective Ellison arrived at Insurance Hole, he searched and photographed the van and the surrounding area. He also questioned Ricky Bishop who lived on Greene Mountain Road near Insurance Hole. As a result of the questioning, Detective Ellison advised officers to be on the lookout for a white Mitsubishi Eclipse or Plymouth Laser. He then "loaded the van and the body on the rollback and transported it back to the [Department of Transportation (DOT)] and secured it."

The next morning, January 5, 2001, Detective Ellison learned that Angela Cunniff, the victim's wife, had been questioned earlier that morning by Chief Detective John Huffine. Detective Ellison subsequently advised officers that the vehicle they were looking for was Angela's 1990 white Plymouth Laser. Detective Ellison then contacted the Tennessee Bureau of Investigation's (TBI) Violent Crime Response Team (VCRT) and Dr. Greta Harlan, a forensic pathologist, to come "to the DOT to process the van and body." Detective Ellison accompanied Special Agent Kevin Helson and the team to the DOT. While at the DOT, Detective Ellison photographed Angela's Laser, which had been located and impounded.

Later that afternoon, Dr. Harlan arrived at the DOT to transport the victim's body. Before removing the body from the van, Dr. Harlan photographed the van and body and conducted a preliminary examination of the body. Once the body was removed, Dr. Harlan collected pieces of charred clothing and carpet from where the body had lain.

Thereafter, Detective Ellison was informed that the appellant and her husband, Kermit, had been arrested in connection with the murder. He was further informed that the primary crime scene had been located at Pyburn Lane. Detective Ellison and the VCRT drove to the scene. At the scene, the VCRT began flagging and photographing evidence. The red Chevrolet Cavalier that the appellant and Kermit were driving when they were arrested was impounded at the DOT for processing by the VCRT.

At 7:30 p.m. that evening, Detective Ellison returned to the sheriff's department to question the appellant and Kermit. He was subsequently informed by fellow officers that two homes on Pyburn Lane had been searched and items taken into evidence, including a green Polaroid camera, a plastic wallet insert, a Polaroid photograph of Kermit working on a piece of equipment, and a Polaroid photograph of the appellant. The appellant had previously informed Detective Ellison that

---

[1] Because the appellant and Kermit Penley share the same last name, and the victim and Angela Cunniff share the same last name, we have elected to utilize first names for the purpose of brevity. We intend no disrespect to these individuals.

she and Angela had taken the camera from the victim's motel room. She explained that the photograph of Kermit was taken two and a half hours after the murder and her photograph was taken the next morning by Richard Guy. Detective Ellison noted that in the appellant's photograph, the photograph of Kermit can be seen laying on the table.

On January 8, 2001, Detective Ellison obtained and served arrest warrants charging the appellant and Kermit with first degree murder. Shortly thereafter, the appellant asked to speak to Detective Ellison. The appellant waived her rights and agreed to a second interview, which interview was recorded on audiotape and played for the jury at trial. Following the interview, the appellant consented to the collection of blood and hair samples for DNA testing.

On January 10, 2001, Angela was arrested. That same day, officers executed a search warrant on her home; however, they discovered nothing of relevance. Six days later, officers conducted another search of Angela's Plymouth Laser, taking into evidence a license plate, a Husky toolbox, and "a metal clipboard type container" which contained the victim's checkbook, birth certificate, letters to the victim, and three Polaroid photographs taken from the same roll of film as the previously discovered photographs of the appellant and Kermit. Detective Ellison ran a registration check on the license plate, which check revealed that the license plate was for a 1980 Ford Pickup truck registered to Angela.

Detective Ellison testified that the appellant had informed him that on the day following the murder, Richard Guy had purchased several tools from Kermit. Detective Ellison interviewed Guy, taking into evidence an electrician's tool pouch, hand tools, and a black plastic box containing a skill saw.

On January 23, 2001, Detective Ellison received the victim's medical and dental records from the Florida Department of Correction, from which the victim had recently been released. Detective Ellison gave the records to County Coroner Ray Crum and asked that he deliver the records to Dr. Harlan for use in the identification of the body. Two days later, Dr. Harlan performed the autopsy at which Detective Ellison was present.

Detective Ellison testified that in the appellant's statement on January 8, 2001, she described items of evidence that she and Kermit had attempted to destroy, namely the victim's credit cards. Detective Ellison testified that the appellant told him that

> [she] and Kermit had attempted to use the victim's credit cards the next morning. They were unsuccessful. They got scared when they were asked questions. At that point, she said that she had cut the credit cards up into small pieces, put them in a plastic zipper lock type bag, and when she and Kermit left Bea Penley's house the next morning she gave it to Kermit, Kermit opened the bag and strung them up and down the ditch line on Pyburn Lane . . . .

Detective Ellison related that he drove to Bea Penley's residence on Pyburn Lane and walked the "ditch line." He located several pieces of credit cards, pieces of a social security card, and pieces of a Discover credit card statement. The letters on these items appeared to spell the victim's name.

The appellant told Detective Ellison that following the murder, Angela asked her to return two pairs of jeans that Angela had purchased at K-Mart. The appellant returned the jeans for a refund of approximately $40. Detective Ellison questioned the supervisor at the K-Mart store where the jeans had been returned. The supervisor provided Detective Ellison with a return receipt dated January 4, 2001, for approximately $40. Thereafter, Detective Ellison returned to Pyburn Lane and widened his search of the "ditch line." Detective Ellison located a Florida identification card belonging to the victim.

On cross-examination, Detective Ellison denied speaking to the appellant for an hour prior to recording her statement on January 8, 2001. He further maintained that he never told the appellant, "Poor old Jack [Potter] . . . he[] don't know what's going to happen to him . . . because his daughter's going to be in trouble." Detective Ellison explained that Jack Potter's daughter was Angela "Potter" Cunniff. At the time of the offense, Jack Potter was a dispatcher at the Greene County Sheriff's Department, but he had since been assigned as a guard at the Greene County Jail. Detective Ellison acknowledged that Angela was a "narc" for the Greene County Sheriff's Department.

Detective Ellison conceded that the appellant's fingerprints had not been found on any of the evidence; however, he explained on redirect that there was no fingerprint evidence in this case. Detective Ellison stated that the van driven by the victim had been stolen in Florida in October 2000, about the same time as the victim's release from the Florida Department of Correction. Detective Ellison further stated that he had no knowledge of whether the Greene County Sheriff's Department had "sealed Pyburn Lane" or whether Jack Potter had gone to Pyburn Lane to "put stuff up there."

Detective Ellison was unable to recall the appellant telling him that the victim was driving in an erratic manner or playing music in the van. Detective Ellison was also unable to recall the appellant stating that she had been afraid of the victim on the date of the offense. However, he related that the victim had a blood alcohol content of .26 percent. Detective Ellison acknowledged that the sheriff's department had previously taken pictures of a Dodge Neon belonging to the appellant, which vehicle appeared to have bullet holes in it.

Brevine Patel, owner of the Greene Villa Motel, testified at trial that on January 3, 2001, a woman claiming to be Angela Potter asked to rent a room for her "brother." The woman informed Patel that her brother was from Italy and did not speak English. The woman paid for the room with cash. Patel identified Angela as the woman who rented the room and the victim as the "brother." The following evening, Patel's husband checked them out of the room. Patel testified that when she cleaned the room, she discovered a "gray-blue T-shirt, and three or four socks, which I threw in the trash."

Scottie Earp testified at trial that he was an employee supervisor at Blevins Electric, where his duties included accepting applications for employment. On January 4, 2001, he accepted an application from and conducted an interview of the victim. Earp stated that the victim had applied for a position as an electrician. According to Earp, the victim was qualified for the position and "ma[d]e a good appearance." The victim did not appear to be intoxicated.

On cross-examination, Earp acknowledged that the victim had indicated on his employment application that he had previously been employed as a job supervisor at the "DOC." Earp explained that he did not realize that the "DOC" meant the Department of Correction, or that the victim had been incarcerated. Earp related that he would not have considered hiring the victim if he had known that the victim lied about his incarceration.

Richard Bishop testified at trial that he lived at 950 Greene Mountain Road in the house nearest Insurance Hole. He stated,"[On January 4, 2001,] I . . . heard tires spinning, like going on the ice in front of my house. I looked out the door and seen two vehicles." The first vehicle was a dark colored van, and the other vehicle was a white Mitsubishi Eclipse or Plymouth Laser. Bishop assumed the vehicles were attempting to drive over the mountain. He related that the person sitting in the passenger seat of the van "was . . . a big-boned lady. She had probably shoulder-length, reddish-colored hair and . . . a big face." Bishop identified a photograph of Angela's white Plymouth Laser as the vehicle being driven behind the van.

Robert Ingram testified that he spent a great amount of time on Viking Mountain backpacking, bicycling, and sightseeing, and was familiar with Insurance Hole. He related that at 4:30 p.m. on January 4, 2001, he drove to Greene Mountain to watch the sunset. Ingram testified, "And as I got on Jones Bridge Road and approached the city limits . . . , I saw a large plume of smoke coming from the vicinity of Greene Mountain Road area." Ingram proceeded to Insurance Hole. At the border of the Cherokee Forest, snow covered the ground, and Ingram observed tire tracks leading into the ditch along the side of the road. Ingram testified that it appeared that "somebody was having trouble getting their vehicle up there."

As Ingram approached Insurance Hole, he observed a burning vehicle. Ingram drove to the site of the vehicle and waited while the fire "burned down substantially." Ingram then approached the vehicle to see if there was "a body or some[one] in need of assistance." When he did not observe anyone inside the vehicle, he called 911. As he waited for assistance, Ingram looked around the area and observed several sets of footprints. He stated, "[I]t was like a large footprint that I thought would have been a man, and a smaller set which I assumed would have been a woman's prints."

Approximately thirty minutes later, a volunteer fireman arrived. By this time, the sun had set. Both Ingram and the fireman inspected the vehicle and observed what appeared to be "a dog or possibly a human body . . . behind the backseat near the rear door." Ingram explained that because the body was smoldering, they put snow on it to extinguish the flame.

Richard Guy testified at trial that the appellant and his cousin, Kermit, were married and lived with Kermit's parents. On January 5, 2001, Kermit called and asked Guy to come to his parent's house because he had a Christmas present for him. When Guy arrived at the house, Kermit gave him an electrician's tool pouch and offered to sell him a cordless skill saw and a toolbox containing "little tools." Guy observed that Kermit was wearing a nice necklace and watch. Guy stated that the appellant was present when Kermit initially offered to sell the tools; however, he and Kermit went outside to a shed where Guy purchased the tools for $140. Guy testified that when he learned of the murder, he took the tools to the sheriff's department.

John Huffine, the chief of detectives with the Greene County Sheriff's Department, testified that in the early morning hours of January 5, 2001, he was notified that a body had been discovered in a burned van on Viking Mountain. Around 6:30 a.m., Jack Potter called Chief Huffine at home. Chief Huffine related that Jack Potter was the dispatcher on duty, as well as Angela's father and the appellant's uncle. Following Jack Potter's call, Chief Huffine drove to the sheriff's department, where he interviewed Angela in the presence of Jack Potter. At that time, Angela was not a suspect in the murder.

As a result of the interview, Chief Huffine asked Angela to call the appellant and initiate a discussion of the murder. Chief Huffine informed Angela that he was going to record the telephone conversation on audiotape. The recording of the telephone conversation between Angela and the appellant was played for the jury. During the telephone call, Angela informed the appellant that the discovery of the body had been reported on the news and she was nervous. The appellant refused to talk with Angela on the telephone, but agreed to talk with her in person at a later time.

On cross-examination, Chief Huffine acknowledged that although Angela was the wife of the victim, she did not "come forward" until twelve hours after the murder. However, he stated that nothing she said during questioning led him to believe she was a suspect in the murder. Chief Huffine conceded that during the appellant's telephone conversation with Angela, the appellant did not admit to stabbing or robbing the victim. Chief Huffine further conceded that the burning of the van occurred post-mortem. Chief Huffine acknowledged that Angela "had been working as a paid undercover informant for the Third Judicial District Drug Task Force."

Greene County Sheriff's Deputy David Smith testified that shortly before his shift ended at 3:00 p.m. on January 5, 2001, he was contacted by an officer in the Central Intelligence Division (CID) and asked to assist in the arrest of the appellant and Kermit on Pyburn Lane. The officers assembled at nearby Baileyton School to stage the arrest. According to Deputy Smith, Pyburn Lane was the only access to the "dead-end hollow, commonly known as Penley Hollow." The officers decided that an officer would drive down Pyburn Lane to determine if the appellant's red Chevrolet Cavalier was in the hollow. Deputy Smith put a flannel shirt over his uniform and drove a silver Toyota pickup truck into the hollow to avoid "tipping [the appellant and Kermit] off."

As Deputy Smith passed the house where the CID had surmised that the suspects would be, he observed that the Cavalier was not there. Deputy Smith drove further into the hollow. Deputy Smith testified,

> As I proceeded on past the house, I probably went another half a mile, and as [I drove] into a wooded area, . . . [on] the right side of the roadway, there [was] a little pull-off area where people come and they pull off and park. . . . I saw a vehicle matching the description [of the appellant's vehicle] as I approached that area . . . .

The appellant and Kermit were standing near the Cavalier.

Deputy Smith drove past the couple and radioed the other officers, informing them that he had located the suspects. Thereafter, he turned to drive out of the hollow. When he drove past the area where he had observed the appellant and Kermit, they were no longer there. Deputy Smith subsequently observed the Cavalier turning right into the driveway of the house where the officers had initially expected to find the couple. Deputy Smith and the other officers proceeded to the house and apprehended the couple.

Detective Sergeant Vincent Tweed of the Greene County Sheriff's Department testified that on January 4, 2001, he was advised that there had been a homicide and to be on the lookout for a white Mitsubishi Eclipse or Plymouth Laser. The following day, Detective Tweed assisted Chief Huffine in taking Angela's statement. After obtaining her statement, Chief Huffine met with officers to plan the arrest of the appellant and Kermit. The officers assembled at Baileyton Elementary School. Upon being advised by Deputy Smith of the appellant and Kermit's location, the officers "were forced to move with haste to try to apprehend [the couple.]"

The officers drove to Alice Lou Morelock's residence on Pyburn Lane where they observed the appellant's maroon Chevrolet Cavalier. The officers surrounded the house in order to prevent an escape. Detective Tweed observed the appellant and Kermit exit the basement door and he quickly ordered the couple to the ground. As another officer advised the couple of their rights, Detective Tweed placed handcuffs on their wrists. Detective Tweed then conducted a pat down search of Kermit and discovered an "Old Timer pocket knife on his person," which knife appeared to be stained with blood. Detective Tweed gave the knife to TBI Agent Kevin Helson. Detective Tweed also took as evidence the necklace and watch worn by Kermit. The maroon Cavalier was impounded and transported to the DOT.

Later that day, Detective Tweed went to the residence of Kermit's parents, Bea and Charlie Penley, which residence was located on Pyburn Lane. Charlie Penley signed a consent form giving officers permission to search the residence. Therein, officers discovered various items which had been described by Angela in her statement. These items included a green Polaroid camera, a Polaroid photograph of Kermit, and a Polaroid photograph of the appellant. A plastic wallet insert was discovered in the kitchen garbage can. Detective Tweed observed that the insert had "numbers,

like credit card impressions, on the plastic." The wallet insert was subsequently delivered to the TBI for analysis.

Detective Tweed testified that on January 8, 2001, he went to Greeneville to speak to motel owners, Paul and Brevine Patel. Upon being shown photographs of the victim, the appellant, Angela, and Kermit, Paul Patel identified the victim as the man who stayed in the motel room. He also identified the appellant as the "woman in her twenties, . . . that brought the motel key back to him." Brevine Patel identified Angela as the woman who rented the room for the victim.

On cross-examination, Detective Tweed conceded that it was possible that Jack Potter knew the officers had been advised to be on the lookout for the vehicle belonging to his daughter, Angela. Detective Tweed further acknowledged that Angela's vehicle had a license plate that read, "La Cosa Nostra," which was a "mob term."

Detective Sergeant Jeff Morgan of the Greene County Sheriff's Department testified that on January 5, 2001, he participated in the arrest of the appellant and Kermit. He related that when they arrived at the Morelock residence, he and Detective James Randolph entered the back door of the house. Shortly thereafter, they were notified that the couple had been taken into custody.

Detectives Morgan and Randolph proceeded to the primary crime scene on Pyburn Lane to meet Chief Huffine who was accompanied by Jack Potter and Angela. After Chief Huffine directed the detectives to the primary crime scene, he, Jack Potter, and Angela left. At trial, Detective Morgan explained that at the primary crime scene, a creek ran beside Pyburn Lane. In the creek lay a "large piece of . . . black plastic." Across the creek where the primary crime scene was located, Detectives Morgan and Randolph discovered "some torn-up personal checks." On Pyburn Lane, they discovered a "burn pattern" and "there was a red substance on the ground that appeared to be blood."

Detective Morgan testified that on January 8, 2001, he and Detective Randolph returned to the residence of Kermit's parents to collect additional evidence. Detective Randolph discovered two toolboxes hidden behind a bush in front of the residence. In the kitchen, the detectives discovered a black case containing a "battery-powered drill."

On cross-examination, Detective Morgan identified a photograph of Angela's vehicle and the front license plate which read, "La Cosa Nostra." He acknowledged that Angela's statements led to the development of the appellant as a suspect in the murder. Detective Morgan conceded that when he and Detective Randolph met Chief Huffine at the primary crime scene, Pyburn Lane was not blocked. However, he stated that upon their arrival, Detective Randolph placed his vehicle "across the driveway going into the crime scene," where it remained until the VCRT arrived.

Detective Sergeant James "Buddy" Randolph of the Greene County Sheriff's Department testified that on January 5, 2001, he participated in the arrest of the appellant and Kermit. Thereafter, he met Chief Huffine at a vacant trailer on Pyburn Lane. On January 8, 2001, he went to the home of Bea Penley where he recovered various tools.

Federal Bureau of Investigation Special Agent Kevin Helson testified that in January 2001, he was employed as a forensic scientist with the TBI. Agent Helson was the leader of the VCRT that was summoned to Greene County, Tennessee, on January 5, 2001, to examine a white Plymouth Laser and a van for evidence of a homicide. Inside the Laser, the VCRT discovered a license plate and a "gray folder book" containing various photographs and papers, including the victim's birth certificate. Various items were also removed from the van and submitted for analysis. Carpet and clothing from underneath the body were preserved in metal containers and sent to TBI Special Agent Linda Littlejohn, a trace examiner in Nashville.

Thereafter, Agent Helson was asked to process a red Chevrolet Cavalier. Agent Helson identified photographs of the vehicle, including a photograph of the inside of the trunk. Inside the trunk, Agent Helson discovered a knife and blood. Agent Helson submitted the knife to TBI Special Agent Meredith Rogers for DNA analysis.

Agent Helson testified that at 5:15 p.m., he was advised of the location of the primary crime scene. He proceeded to the crime scene, which had been roped off to protect areas where shoe prints and tire tracks were visible. Agent Helson testified that the shoe prints and tire tracks suggested that there had been "a lot of commotion there, a lot of movement."

Agent Helson testified that officers on the scene had already marked items of evidence. Charred clothing and blood were located near "a tile . . . which basically ran under the little dirt road that we were on." The charred clothing and a swab of the blood were submitted to Agent Rogers for DNA and blood analysis. Agent Helson also collected a plastic garbage bag that appeared to have blood on it, additional pieces of charred clothing that appeared to be stained with blood, and torn papers with the victim's name on them that had been discovered along the road, all of which were submitted for analysis. Agent Helson also submitted for analysis the knife taken from Kermit as he was being arrested by Detective Tweed.

Laura Hodge, a forensic scientist with the TBI crime laboratory in Nashville, testified that she specialized in the analysis of fire debris and gunshot residue. In the instant case, Agent Hodge received two one-gallon cans containing pieces of charred clothing removed from the van and a piece of charred shirt discovered at the primary crime scene. She analyzed the clothing for the presence of petroleum distillates. Agent Hodge testified, "My analysis revealed the presence of a gasoline-ranged product. Products in this range include all brands and grades of automotive fuels including gasohol. This ignitable liquid residue was in an evaporated state."

Linda Littlejohn, a forensic scientist with the TBI in Nashville, testified that she examined a plastic wallet insert taken into evidence by Detective Tweed. Agent Littlejohn examined the wallet insert to compare the impressions in the plastic sleeves with the numbers on credit cards. She found one impression to be consistent with the number on a Discover Platinum credit card issued to Angela Cunniff. Another impression matched the number on an Associates Visa credit card also issued to Angela Cunniff. On the opposite side of the sleeve, Agent Littlejohn discovered the impression of another credit card issued to Michael Cunniff.

Meredith Rogers testified at trial that in January 2001, she was employed as a forensic scientist with the TBI's DNA and Serology Unit. While so employed, she performed blood and DNA analysis on evidence submitted to her in the instant case by Agent Helson. The evidence included blood collected from the victim's body by Dr. Harlan, blood samples collected from the appellant and Kermit, a swab of blood from the tile at the primary crime scene, the black plastic garbage bag, a burned piece of clothing with "RBS" recovered from the primary crime scene, the large Old Timer knife recovered from the trunk of the Cavalier, a swab of blood from the trunk of the Cavalier, the Old Timer pocketknife taken from Kermit at his arrest, the plastic wallet insert, and other pieces of charred clothing recovered from the primary crime scene. The blood on the tile, the plastic bag, the pieces of charred cloth, and the knives matched that of the victim. The analysis of the swab from the trunk revealed a partial profile from which Rogers was unable to exclude Kermit as a partial contributor. The analysis of the plastic wallet insert revealed a "mixture of genetic material that matched Kermit Penley as the major contributor." However, Rogers was unable to exclude the victim and Angela as contributors to the DNA found on the wallet insert.

Dr. Greta Harlan, a forensic pathologist at East Tennessee State University, testified that on January 5, 2001, the Greene County Sheriff's Department requested that she come to Greene County to investigate a badly burned body discovered behind the backseat of a burned van. Dr. Harlan subsequently removed the body from the van and collected materials and fibers from underneath the body. According to Dr. Harlan, the body was so badly burned that identification was impossible without the comparison of medical and dental records. Dr. Harlan testified that she did not perform an autopsy at that time because she did not want to destroy tissues that might be necessary to make an identification. She explained, "We instead waited for the authorities to get us the materials that would be available on the person they thought it might be in order to make the comparison before we destroyed something that might be a valid comparison point." However, "by eyeballing the remains," Dr. Harlan was able to determine that the body "was badly burned, that there was a lot of blood that had managed to become attached to the neck area that had somewhat protected the neck, and that it was a male human body." Dr. Harlan subsequently received the victim's medical and dental records from the Florida Department of Correction. By comparing the dental records, Dr. Harlan was able to determine that the body was that of the victim.

Dr. Harlan performed the autopsy on January 25, 2001. Based upon the autopsy, Dr. Harlan determined that the cause of death was "an incised wound, meaning a cut, to the neck transecting the right internal carotid artery." She explained that the cutting of the carotid artery caused a loss of blood and lack of blood supply to the victim's brain. Dr. Harlan testified that once the artery was cut, "unconsciousness would have occurred . . . within just a matter of seconds. And then [the victim] would have been unable to move or do anything else." The lack of blood would have induced a massive stroke. She stated that once the wound was inflicted, the victim would not have recognized his surroundings or his assailants.

Dr. Harlan testified that the wound measured 5.3 inches in length and 1.3 inches at its deepest point. According to Dr. Harlan, the wound was caused by a heavy, sharp blade, such as a hunting knife, and would have been "much more easily inflicted if the head were extended back." Although

Dr. Harlan was unable to recall whether she had discovered any "material" in the wound, in her report she had noted the discovery of "a fragment of a knit fabric, blood soaked portion of an anterior neck band of a shirt showing a partial incised defect at one margin overlying the incised defect of the neck." Dr. Harlan testified that there was minimal evidence of smoke inhalation prior to death, only an amount as would be present in the lungs of one who smoked. She opined that the victim was dead when his body was placed in the back of the van. The toxicology reports revealed that the victim had a high level of alcohol in his blood and urine.

On cross-examination, Dr. Harlan was asked whether "more than one knife [was] utilized in the cutting of [the victim's] throat." Dr. Harlan responded,

> [I]n order to [achieve] this cut, there would have had to been [sic] a knife of a decent heft. . . . If they had produced a smaller wound that did not work, I would not be able to see that, if they went back through the same path with a bigger knife. So the fatal wound was [caused] by a slash. Whether additional attempts at slashing were there or not might have been hidden by the fact of there being the big knife cut.

Dr. Harlan acknowledged that the wound may have been caused by "a series of cut and stop from the contours in the neck, but it resulted in a single wound."

Shonna McMacken testified on behalf of the appellant at trial. On January 4, 2001, McMacken was employed as a cashier at the Quick Stop 16 on Snapps Ferry Road. While working the second shift, she encountered a man later identified as Kermit Penley. McMacken stated that she remembered him because he had blood on his shirt which she had assumed was the result of a fight. McMacken testified that Kermit acted "scared."

The appellant testified that she met Kermit at a bar on March 9, 2000, and married him two months later.[2] The night she married Kermit, he beat her and one of her friends. The appellant related that Kermit abused alcohol, drinking approximately a case of beer a day. The appellant claimed that she had attempted to leave him on several occasions, but he prevented her from leaving by taking her vehicle or her keys. In September 2000, Kermit attempted to kill her, shooting at the appellant as she sat in her vehicle. Kermit was subsequently charged with domestic violence and attempted second degree murder, but the case was dismissed because the appellant refused to testify against her husband. According to the appellant, Kermit was "nice" while the charges were pending, but resumed the abuse after the case was dismissed.

The appellant testified that she had not met the victim prior to the day of the murder. She explained that her cousin, Angela, married the victim while the victim was incarcerated in Florida. Angela had previously informed the appellant that the victim was a member of the mafia and had

---

[2]The appellant divorced Kermit in 2002.

been convicted of armed robbery and racketeering. Angela told the appellant that she had been physically abused by the victim upon his release from prison.

On the morning of January 4, 2001, Angela called the appellant and informed her that she and the victim were at the Greene Villa Motel. The victim had a job interview scheduled in Kingsport, and Angela wanted Kermit to accompany them to Kingsport because she was not familiar with the area. Angela also informed the appellant that she had a Christmas gift for her. Kermit agreed to go to Kingsport, and the appellant told Angela that they would come to the Greene Villa Motel once they "g[o]t ready."

While the appellant "g[o]t ready," Kermit drove to the liquor store to purchase beer. As they left for the motel, the appellant called Angela to inform her that they were on their way. When the appellant and Kermit arrived at the Greene Villa Motel, they did not see Angela's vehicle. They parked in front of the victim's motel room, but remained in their vehicle. Shortly thereafter, the victim came out of the motel room and approached the driver's side window. He asked the appellant if she "was Jama Lou." When the appellant responded that she was, the victim invited the appellant and Kermit to come into the motel room.

The appellant and Kermit joined the victim in the motel room, where they consumed beer while they waited for Angela. When Angela arrived, she asked the appellant to come outside so that she could give the appellant her Christmas gift. Thereafter, they went back into the motel room, and Angela and Kermit smoked marijuana. The victim announced that he needed a place to live in Greene County, and the appellant looked in the paper for apartment rentals. The appellant attempted to telephone several renters, but her calls were answered by answering machines. The appellant then offered to lease the victim a mobile home that she and Kermit had recently purchased, describing the condition of the mobile home as "really awful."

The appellant testified that when the time came for the group to leave for the job interview, they decided to drive the victim's van. The victim drove and Kermit sat in the front passenger seat, while the appellant and Angela sat in the rear. The appellant related that the victim was "driving really fast, weaving in and out of traffic." Moreover, the victim continued to consume beer. The appellant and Kermit ingested "some pills" given to them by Angela.

The appellant testified that during the ride to Kingsport, Angela appeared "scared" and began to talk to her in a very "animated . . . excited" manner. The appellant stated, "She told me that she thought [the victim] was going to kidnap us, and kill us, and that we would never get to go home, that the reason that he came down here from Florida was to take her back with him or kill her." Angela repeatedly told the appellant that the victim was going to kill them. The appellant testified that the victim had the rearview mirror angled toward the rear of the van. She stated, "He would look from her to me, from her to me, back and forth." At Angela's suggestion, the appellant and Angela wrote letters informing their families that they had been kidnapped.

-12-

Upon arriving in Kingsport, the victim drove to Blevins Electric. The victim then went inside to submit an employment application and be interviewed for an electrician's position. He came out to the van fifteen minutes later, "got something," then returned to Blevins Electric. While the victim was inside the building, Angela told Kermit that she believed the victim was going to kidnap and kill them. Kermit agreed to kill the victim. The appellant suggested that they leave, but Angela became hysterical, claiming, "[O]h, no, no, he will hunt us down, and he will kill us, he will kill us all." By that time, the appellant was frightened. She exited the van, walked to the curb, and broke a beer bottle, a "shard" of which she placed in the armrest in the back seat.

Thereafter, the victim returned to the van, appearing irritated. He drove to a nearby Amoco Gas Station in order for the appellant and Kermit to use the restroom. As the couple exited the gas station, they observed the victim giving Angela a bracelet and kissing her. Upon leaving the Amoco station, the appellant sat in the front passenger seat, and Kermit sat in the backseat on the passenger side. The appellant observed a shirt hanging over the steering column. She removed the shirt and saw a screwdriver stuck in the ignition. The appellant asked the victim if the van was stolen, but the victim "just looked at [her] and smiled." She exclaimed, "[O]h my God, here we are in a stolen van and you just got out of prison. . . . We're all going to jail." The victim replied, "[H]oney, you don't have to worry about us going to jail over us being in a stolen van because the guy it's stolen from is dead; . . . where do you think you got your necklace from?"

The victim then informed the appellant that he was interested in renting their mobile home and asked to see it. The appellant directed the victim to the mobile home on Pyburn Lane. The appellant testified that as the victim drove to the mobile home, he played one song five or six times. According to the appellant, the song affected the victim's behavior. The appellant related that the victim "started driving really fast again. And he was yelling, and he would beat his head off the steering wheel."

When the group arrived at the mobile home, the victim and Kermit went inside the mobile home. Because there was no running water inside, the appellant walked behind the mobile home to urinate. There she observed Angela talking on her cellular telephone to Randy Hyatt, a man Angela had met on the internet. The appellant observed that, despite being hysterical earlier, Angela appeared calm. Angela asked the appellant to speak to Hyatt and tell him "that she was the other Angie." The appellant complied, then returned the telephone to Angela.

After Angela finished her telephone call, she and the appellant walked to the front of the mobile home. The victim and Kermit had exited the mobile home, but the victim soon walked behind the mobile home to urinate. At that time, Angela became hysterical, saying that the victim was going to kidnap and kill them. Angela offered Kermit $40,000 to kill the victim. She explained that the money was from the "Gomez trial money . . . where they treated prisoners bad and it was some kind of lawsuit against something." Kermit, who was "pretty high," asked Angela if she were serious. Angela replied that she was serious.

Shortly thereafter, the victim returned from behind the mobile home, and the group got back into the van to leave. As the victim drove away from the mobile home, Kermit turned around and looked at the appellant and Angela. The appellant testified that the color had drained from his face and his eyes had filled with tears. According to the appellant, Kermit appeared to be scared. Angela grabbed the appellant's arm and told Kermit, "Do it, do it." The appellant shook her head and said, "Do it."

Kermit placed his left hand over the victim's forehead and pulled his head back. He then took his knife and "stuck the knife in the upper side of his neck and . . . was coming around this way [when the victim] grabbed his hand, and they were . . . struggling." The victim said, "Angela, I love you, why are you doing this? . . . I came here to be with you." The victim then asked Kermit, "Man, why are you doing this to me." Kermit replied, "[B]ecause you're going to kill us, mother f***er."

The appellant and Angela started screaming and attempted to exit the van. However, the sliding rear doors would not open because of the childproof locks. Kermit ordered Angela to lean over the seat and put the van in park. She complied as she and the appellant continued to scream. Kermit told them to be quiet, saying, "[W]e're all in this together." He then told Angela to grab the knife the victim kept in a sheath on his side. She complied. At that time, either the victim or Kermit unlocked the van doors, and the appellant and Angela exited the vehicle. Angela then handed the victim's knife to the appellant.

Kermit ordered the appellant and Angela to come to the other side of the van. Kermit had removed the victim from the van and laid him on the ground. The appellant testified that the knife was still stuck in the victim's neck. Kermit ordered the appellant to bring him the victim's knife, but the appellant stood there. Kermit said, "[B]ring it to me now . . . [and] open it." The appellant walked to Kermit and attempted to hand him the knife; however, he was unable to grasp it because the victim was still holding his hand. Kermit told the appellant to "[h]old it here," indicating that she was to hold the knife to the victim's neck.

The appellant testified that she held the knife at the victim's neck until Kermit released the other knife and freed himself from the victim's grasp. According to the appellant, the victim began "jerking, and . . . making this gargling noise." The appellant started screaming at Kermit to take the knife. As soon as Kermit grabbed the knife, the appellant turned and walked away. She then heard Kermit stab the victim twice. The appellant testified, "Kermit stood there with that knife in his hand and he told us if we ever snitched he'd hunt us down and kill us."

Kermit then ordered the appellant to go into the mobile home and find a plastic garbage bag, but she was unable to move. Kermit threatened, "I'm putting [the victim] in the van, and if you don't do everything I tell you to, you're going to be the next one I put in there." The appellant entered the mobile home, found a plastic bag, and emptied it. She handed the bag to Kermit who placed the bag over the victim's head. He took the victim's necklace and watch and placed them in his pocket. He also took the victim's wallet and handed it to the appellant. The appellant placed the wallet in

-14-

Kermit's coat pocket. Thereafter, Kermit picked up the victim and placed him in the back of the van. Angela shut the door.

Kermit and Angela decided to dispose of the victim's body at Insurance Hole on Greene Mountain Road. Because the appellant had a valid driver's license, Kermit told her to drive. Kermit sat in the front passenger seat of the van, and Angela sat in the back seat. The appellant testified that Angela appeared "normal." Angela told the appellant and Kermit that the victim had once said "that he could kill her and drink a six-pack of beer and watch her body get cold and that's what she was going to do now."

The appellant drove to the Greene Villa Motel. The appellant and Angela went into the victim's motel room to collect his belongings, while Kermit, covered in blood, drove the van to a nearby Hardee's Restaurant. The appellant maintained that she had not stolen any of the victim's property until she and Angela returned to the motel after the murder. After collecting the victim's property, the appellant drove her Chevrolet Cavalier, and Angela drove her white Plymouth Laser to the Hardee's Restaurant to meet Kermit. At the Hardee's Restaurant, the appellant and Angela got into the van, Kermit got into the Laser, and they drove to the Camp Creek Corner Gas Station. The appellant and Angela filled a "gas jug" with gasoline, and the appellant poured the gasoline throughout the van. She refilled the container with gasoline and placed it between the seats in the van. They then proceeded to Insurance Hole.

The appellant testified that as she drove up Greene Mountain, the roads became covered with snow. The appellant pulled the van into Ricky Bishop's driveway to allow Kermit to pass her. As the appellant drove back onto the road, the wheels of the van "sp[un] where it was real snowy and slick." Nevertheless, she arrived at Insurance Hole, where Kermit parked the van with "the front tire . . . hanging off." Angela poured the remaining gasoline throughout the van, then handed the appellant a rag or piece of a shirt, which the appellant ignited and threw into the van. "[The van] went up in flames."

As the van caught fire, the appellant and Angela ran to the Laser, while Kermit attempted to push the van over the side of the mountain. The appellant feared the van would explode and she shouted at him to leave. Kermit got into the Laser, and Angela began to drive down the mountain. However, because of the icy conditions, Kermit had to drive the vehicle down the mountain to the Hardee's Restaurant. During the drive, Angela assured the appellant that they "did the right thing." Nevertheless, the appellant was "really tore up" and unable to stop shaking.

When they arrived at the Hardee's Restaurant, the threesome transferred the property taken from the victim's motel room to the appellant's Cavalier. Angela told Kermit "to keep it." She also gave the appellant two pairs of jeans to return to K-Mart. Angela then told the appellant and Kermit that they were never to discuss the murder. Angela drove away in her Laser, and the appellant and Kermit drove to K-Mart in the appellant's Cavalier to return the jeans.

-15-

Upon arriving home, the appellant and Kermit carried the victim's property into the house. Kermit's father was at home and asked, "Who did you rob now?" Kermit responded that Angela and the victim were divorcing, and she had given him the victim's property. When Kermit's mother returned home, she asked him why he was covered in blood. Kermit replied that he had helped "skin a deer." Observing that the appellant had blood on her pants, Kermit's mother asked the appellant if she had helped skin the deer. The appellant replied that she had helped "a little." The appellant and Kermit then went to the residence of Kermit's grandmother to shower.

The following day, Angela telephoned the appellant. The appellant testified that Angela sounded as though "she was fishing for something, trying to trick me into saying something." Later that day, the appellant was arrested and questioned by Detective Jim Ellison. During questioning, Detective Ellison mentioned Jack Potter and Angela, saying, "Poor Jack this, and poor Jack that." The appellant told Detective Ellison that Angela had offered to pay Kermit $40,000 to kill the victim. However, Detective Ellison did not believe her, stating, "[Y]ou expect me to believe that? Angela don't have a pot to piss in or a window to throw it out of."

The appellant claimed that on January 8, 2001, Detective Ellison questioned her for over an hour before recording her statement. She testified that he also stopped recording several times during the questioning. The appellant stated that when the tape recorder was turned off, she was questioned about holding the knife to the victim's throat.

On cross-examination, the appellant conceded that although she and the others had several opportunities to escape from the victim, such as while they were at Blevins Electric, McDonald's, or the Amoco Gas Station, they did not leave or seek help. She also admitted that she directed the victim to the abandoned mobile home on a dead-end street, despite her belief that the victim was going to kill her. When speaking on the cellular telephone to Randy Hyatt, she did not tell him that she was "in fear of [her] life." Moreover, when Angela offered Kermit $40,000 to kill the victim, she did not object. However, the appellant claimed that she did not know that Kermit was going to kill the victim. Nevertheless, she admitted that once they were in the van, she told him to "do it."

The appellant claimed that she held the knife to the victim's throat for "not even a second. It was just long enough for me to switch hands." The appellant denied stabbing the victim, but conceded that after the murder, she asked Kermit if she had stabbed the victim. The appellant stated that Angela first asked Kermit to kill the victim while they waited for the victim outside of Blevins Electric, and Kermit responded that "if he was going to do it, it would be easier . . . if he was in the back seat." The appellant conceded that when they stopped at McDonald's, she sat in the front passenger seat; however, she claimed it was because "Kermit had already jumped in the back." The appellant acknowledged that she returned the room key to the motel clerk after Angela used the victim's toothbrush to wash the blood from the room key. She further acknowledged that when she stopped the van to allow Kermit to pass her, she observed Ricky Bishop standing in the doorway of his house.

The appellant admitted that as she and Kermit drove home, she threw the victim's identification along the road and subsequently scattered the pieces of his credit cards in Penley Hollow. The appellant noted that in the Polaroid photograph of Kermit taken two hours after the murder, Kermit was still wearing the clothes he had worn when he cut the victim's throat, which clothes were stained with blood. The following day, the appellant and Kermit attempted to destroy the evidence of the murder. "The plan was to sw[eep] everything up . . . in a pile, pour gasoline on it, [and] light it." However, because it was a windy day, the fire began to burn out of control, and the appellant and Kermit had to "stomp it out." Thereafter, the appellant observed a truck belonging to Baileyton Police Officer David Shell driving up the mountain. After alerting Kermit to the presence of the truck, she and Kermit drove to "Lou's."

Randy Hyatt testified that on January 4, 2001, he spoke to Angela on the telephone. Hyatt had met Angela on the internet two and a half weeks prior to the murder. Hyatt testified that when he spoke to Angela on the day of the murder, the tone of her voice sounded "normal." Hyatt related that he spoke to another person during the telephone conversation, but that person only said, "Hey."

Forensic psychiatrist Keith Caruso, an assistant clinical professor at Vanderbilt University, testified that he was employed by the defense to determine "what was going through [the appellant's] mind at the [time of the murder] and why she did what she did . . . ." Dr. Caruso conducted two interviews of the appellant. On July 13, 2001, he interviewed the appellant for seven hours, and on September 7, 2001, he interviewed the appellant for five hours. He also interviewed the appellant's parents and reviewed the appellant's prior statements, statements of her co-defendants, discovery materials, and police reports.

In diagnosing the appellant, Dr. Caruso also considered the appellant's background. Dr. Caruso testified that the appellant's parents divorced when she was one year old, and the appellant and her mother developed an unusually close relationship in which her mother satisfied her own emotional needs through the appellant. However, when the appellant was six years old, her mother remarried, leaving the appellant feeling displaced.

Shortly thereafter, the appellant began participating in beauty pageants. Although the pageants provided a means by which the appellant obtained the attention of her parents, the pageants also overemphasized the importance of beauty and were very stressful for the appellant. The stress worsened after the appellant developed alopecia, a condition which causes the loss of hair. Nevertheless, the appellant continued to compete in pageants, wearing wigs to hide the hair loss. However, at school, the appellant was the object of teasing by the other students as a result of the hair loss. As a result of the teasing, the appellant transferred to another school when she was fourteen years old. That same year, she was the victim of a date rape.

Thereafter, the appellant developed a tendency to become involved in abusive relationships. For example, one of her boyfriends pushed her through a plate glass door, ending a potential modeling career. The appellant also had two abusive husbands prior to her marriage to Kermit. To end her abusive relationships, the appellant "would turn to other men to threaten the [abusive] suitor

to keep them from coming after her." Kermit was also abusive, becoming intoxicated and beating the appellant. During their short marriage, Kermit allegedly broke the appellant's nose, choked and shot at her, and wrecked her vehicle to prevent her from leaving him.

The appellant had two children from prior marriages. However, the appellant was unable to deal with the responsibility of raising her children. Her son, who suffered from diabetes, was in the custody of her parents, and the appellant was involved in a custody battle for her daughter. Dr. Caruso noted that the appellant had developed a habit of turning to others to make her decisions and handle her responsibilities.

Based on the foregoing, Dr. Caruso determined that the appellant suffered from three disorders which affected her mental state at the time of the murder. He diagnosed the appellant as suffering from post-traumatic stress disorder as a result of being raped when she was fourteen years old. He explained that post-traumatic stress disorder was a severe mental disease "which tends to make people [who have] been traumatized, over interpret . . . the danger in a possible situation." Dr. Caruso testified that after Angela informed the appellant that the victim had abused her and that he was going to kill them, the appellant believed that she was in "a very dangerous situation." Dr. Caruso also diagnosed the appellant with major depression. However, he testified that at the time of the offense, the post-traumatic stress disorder was having a greater impact on the appellant's mental state.

Dr. Caruso also determined that the appellant suffered from dependent personality disorder, which explained why she did not take advantage of her opportunities to escape. Dr. Caruso related that

> [s]omeone with dependent personality disorder tends to have a great deal of difficulty initiating things on their own. They have trouble making their own decisions. They have trouble expressing a disagreement with other people. They may go to excessive lengths to obtain some kind of nurturance or validation from other people. They may stay in very, very bad or abusive relationships. . . . They have unrealistic fears about being left to care for themselves, and essentially often cho[o]se people in situations that lead to bad outcomes for them.

Dr. Caruso explained that at the time of the offense, the appellant was "looking to others for the solution to this problem." In other words, she depended on Kermit to "interven[e]."

Dr. Caruso opined that because the appellant suffered from post-traumatic stress disorder and dependent personality disorder, she did not commit "intentional murder," but instead believed that she was acting in self-defense. He concluded that the post-traumatic stress disorder caused the appellant to perceive "a tremendous degree of threat." Dr. Caruso testified that after Kermit cut the victim's throat, the appellant was acting under extreme duress caused by Kermit, who had threatened

-18-

to kill the appellant or Angela if they reported the crime. According to Dr. Caruso, the appellant "really felt she had no alternative but to follow what [Kermit] said."

On cross-examination, Dr. Caruso acknowledged that he had previously determined that the appellant was competent to stand trial and an insanity defense could not be supported. He conceded that holding a knife to the victim's throat was an intentional act, but claimed that the appellant believed she was acting in self-defense. He also conceded that retrieving the plastic garbage bag to place over the victim's head, pouring gasoline on the victim's body, taking the victim's property, and setting fire to the van were intentional acts; however, he explained that these acts were committed under duress, which duress resulted from the threats of Kermit.

As its last witness, the defense recalled State witness, Chief John Huffine. Chief Huffine testified that after Angela's Plymouth Laser was impounded and contemporaneous to the arrest of the appellant and Kermit, he drove Jack Potter and Angela to the crime scene at Penley Hollow. However, Chief Huffine denied that he was trying to protect Jack Potter and Angela. He stated that at the time of the appellant's arrest, Angela was not a suspect. He explained that Angela's vehicle had been impounded because the appellant and Kermit had occupied the vehicle and the vehicle might have contained evidence of the murder.

Based on the foregoing evidence, the jury convicted the appellant of facilitation of premeditated first degree murder. The appellant was acquitted of the two counts of first degree felony murder. Following a hearing, the trial court sentenced the appellant as a Range I standard offender to twenty-five years incarceration. The appellant now appeals, challenging the denial of her motion for judgment of acquittal and the sentence imposed by the trial court.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, the appellant contends that the trial court erred by not granting her motion for judgment of acquittal. Initially, we note that this court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Moreover, "[a] motion for a judgment of acquittal made at the conclusion of the proof by the state is waived when the defendant elects to present evidence on his own behalf." State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); see also Tenn. R. Crim. P. 29(a). Accordingly, we will address the appellant's first issue as a challenge to the sufficiency of the evidence.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P.

13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is defined in pertinent part as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [Tennessee Code Annotated section] 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2003). Thus, in order to support the appellant's conviction, the State was required to prove that the appellant knew that the victim was going to be murdered and knowingly furnished substantial assistance in the commission of the murder.

The appellant asserts that by not convicting the appellant of being criminally responsible for the murder of the victim, the jury implicitly found that the appellant did not solicit, direct, aid, or attempt to aid the murder, thereby exonerating her of any assistance prior to the murder. See Tenn. Code Ann. § 39-11-402 (2003). The appellant argues that because any assistance she provided was after the murder, the evidence was insufficient to convict her of facilitation. Moreover, she claims that, because she was suffering from severe psychological problems, she could not have "knowingly" assisted in the murder. We disagree with the appellant's contentions.

One is criminally responsible for an offense committed by another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 40-11-402(2). Conversely, a person commits facilitation when, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [Tennessee Code Annotated section] 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). In other words, facilitation is committed without the intent required for criminal responsibility. Contrary to the appellant's assertion, we conclude that by convicting the appellant of facilitation, the jury found that the appellant did not possess the requisite culpability for a conviction of criminal responsibility, not that the appellant provided no assistance prior to the victim's murder.

We also disagree that the appellant could not have "knowingly" assisted in the murder. At trial, Dr. Caruso testified that the appellant suffered from post-traumatic disorder, major depression,

and dependent personality disorder. He opined that as a result of these disorders, at the time of the murder, the appellant believed she was acting in self-defense and under duress. However, the jury rejected these defenses, as well as the effects of intoxication, thereby rejecting the appellant's claim that she was unable to "knowingly" assist in the murder.

We must now determine whether the evidence was sufficient to support the appellant's conviction of facilitation of first degree premeditated murder. The appellant concedes that the jury could have reasonably inferred that she knew a murder was going to be committed. She also concedes that when Kermit turned to her in the van, she told him to "do it." However, the appellant argues that by telling Kermit to "do it," she did not provide the substantial assistance necessary to convict her of facilitation of the victim's murder. However, we conclude that this was not the only evidence that the appellant substantially assisted in the victim's murder.

As the appellant, Kermit, and Angela waited for the victim at Blevins Electric, the appellant participated in the decision to kill the victim, and Kermit agreed to kill the victim. They further discussed changing their seating arrangement so that it would be easier for Kermit to kill the victim. Despite her alleged belief that the victim was going to kill her and the others, the appellant did not attempt to leave or seek help when the victim stopped at the Amoco gas station or the McDonald's. Moreover, she directed the victim to a run-down mobile home on an isolated road. At the mobile home, she spoke to Randy Hyatt on Angela's cellular telephone, but did not ask for help or inform Hyatt that the victim was going to kill them.

Upon leaving the mobile home, Kermit turned to the appellant and Angela. Angela grabbed the appellant's arm and told Kermit, "Do it, do it." The appellant shook her head and said, "Do it." Thereafter, Kermit grabbed the victim's head and slit his throat. Kermit subsequently dragged the victim to the ground and asked the appellant to bring him the knife that Angela had taken from the victim. The appellant complied, assisting Kermit by holding the knife to the victim's throat while the victim began "jerking, and . . . making this gargling noise." Kermit then grabbed the knife, and the appellant heard him stab the victim twice. Kermit gave the appellant the victim's wallet, which she placed in Kermit's coat pocket. Thereafter, the appellant assisted in concealing the crime by collecting the victim's belongings from the motel room, pouring gasoline on the victim's body as it lay in the rear of the van, driving the van to Insurance Hole on Greene Mountain Road, and setting the body and van on fire. Reviewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support the appellant's conviction of facilitation of premeditated murder.

### B. Sentence

Next, the appellant challenges the sentence imposed by the trial court. When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). However, this presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles

and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the record demonstrates that the trial court failed to consider the sentencing principles and the relevant facts and circumstances, review of the sentence will be purely de novo. Id.

In conducting our review, this court must consider (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to the sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the appellant on his or her own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also Ashby, 823 S.W.2d at 168. The burden is on the appellant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

The appellant was sentenced as a Range I standard offender, for which the applicable range for Class A felonies is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1) (2003). The presumptive sentence for a Class A felony is the midpoint within the applicable range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If the trial court finds that such factors do exist, the court must start at the presumptive sentence, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). There is no mathematical formula for valuating factors to calculate the appropriate sentence. State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the trial court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76.

In sentencing the appellant, the trial court considered the presentence report, which revealed that the appellant had a lengthy criminal history, including prior convictions for leaving the scene of an accident involving bodily injury and worthless checks.[3] The trial court also considered the testimony of the appellant's mother, stepmother, and minister. The cumulative testimony of these witnesses, as well as the appellant's own testimony at trial, revealed that the appellant showed great remorse for her part in the victim's murder. Moreover, the appellant's mother and stepmother emphasized that the appellant's children needed their mother. All of the witnesses asked the trial court to show mercy in sentencing the appellant.

The trial court found no applicable mitigating factors and applied the following enhancement factors:

---

[3]Although it is clear from the transcript of the sentencing hearing that the trial court considered the presentence report, the presentence report was not included in the record on appeal. Accordingly, we rely on the findings of the trial court.

(2) The [appellant] has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; . . .

(6) The [appellant] treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; . . . [and]

(10) The [appellant] possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense.

Tenn. Code Ann. § 40-35-114 (2003). We note that in the instant case, the trial court's sentencing determinations are entitled to a presumption of correctness because the record reflects that the trial court considered the sentencing principles and the relevant facts and circumstances.

On appeal, the appellant concedes that the trial court properly applied enhancement factors (2) and (10), but argues that enhancement factor (6) was inapplicable. Enhancement factor (6) provides that the appellant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense. Tenn. Code Ann. § 40-35-114(6). This factor is generally applied to cases involving abuse or torture. State v. Williams, 920 S.W2d 247, 259 (Tenn. Crim. App. 1995). Before a trial court may apply enhancement factor (6) to increase a sentence, the facts of the case must support a "finding of cruelty under the statute 'over and above' what is required to sustain a conviction for [the] offense." State v. Arnett, 49 S.W.3d 250, 258-59 (Tenn. 2001).

In the instant case, the trial court applied enhancement factor (6), finding,

> The pathologist's testimony, I first thought might preclude [the application of this factor] because the pathologist's testimony was that once this carotid artery was severed, for all practical purposes [the victim] . . . was deceased. But the evidence in the case was that . . . as [the victim] was being cut and . . . the cut was going sort of in stages across his throat and he was struggling, even talking, to [the appellant] and the others and asking why it was being done to him. And then he was still struggling when [the appellant] took the other knife over and . . . held it at the throat of the victim. So I've thought long and hard about it, but I believe that, in fact, is an enhancement factor in the case.

We conclude that the evidence supports the trial court's application of enhancement factor (6).

The appellant also contends that the trial court committed error by not applying the following mitigating factors:

> (1) The [appellant's] criminal conduct neither caused nor threatened seriously bodily injury;
>
> (2) The [appellant] acted under strong provocation;

-23-

(3) Substantial grounds exist tending to excuse or justify the [appellant's] criminal conduct, though failing to establish a defense;
(4) The [appellant] played a minor role in the commission of the offense; . . .
(8) The [appellant] was suffering from a mental or physical condition that significantly reduced the [appellant's] culpability for the offense; . . .
(9) The [appellant] assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses; . . .
(11) The [appellant], although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct;
(12) The [appellant] acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime; [and]
(13) Any other factor consistent with the purposes of this chapter.

Tenn. Code Ann. § 40-35-113.

The appellant argues that the trial court should have applied mitigating factor (1) because the appellant's conduct occurred post-mortem and "could not logically" have caused or threatened serious bodily injury. At sentencing, the trial court disagreed with the appellant's interpretation of the evidence. The trial court stated, "I don't believe that's true from the evidence. [The appellant] was indeed, as the jury found, facilitating the crime prior to and during the killing of the victim in the case." We agree. The appellant testified at trial that when Kermit looked at her prior to cutting the victim's throat, she told him to "do it." Thereafter, the appellant held a knife to the victim's throat, which knife Kermit used to stab the victim two more times. Accordingly, we conclude that the trial court did not err by refusing to apply mitigating factor (1).

Next, the appellant asserts that by refusing to apply mitigating factors (2), (3), (8), and (12), the trial court ignored the "uncontradicted testimony" of Dr. Caruso at trial and the evidence that the appellant was intoxicated at the time of the murder. As previously noted, Dr. Caruso testified that the appellant suffered from post-traumatic stress disorder, major depression, and dependent personality disorder, which disorders caused the appellant to believe she was acting in self-defense and under the duress of her husband, Kermit, thereby reducing the appellant's culpability for the murder. Regarding Dr. Caruso's theory that the appellant was acting in self-defense and under duress, the trial court noted that the appellant had numerous opportunities to remove herself from the situation. The trial court found, "It's just not credible that . . . [the appellant] could not have kept from doing the acts that led to the death of the victim in this case. In fact, every indication is that at least at one point she was willingly encouraging it and willingly helping with it." The evidence does not preponderate against the trial court's findings. The jury rejected the appellant's theory of self-defense. Moreover, this court has previously observed that voluntary intoxication is not a factor

to be considered in mitigating a defendant's sentence. State v. Anthony Tony Sandy, No. M2001-02376-CCA-R3-CD, 2003 WL 213776, at *8, (Tenn. Crim. App. at Nashville, Jan. 30, 2003); State v. Mark A. Stacy, No. E2000-02906-CCA-R3-CD, 2001 WL 487685, at *8 (Tenn. Crim. App. at Knoxville, May 9, 2001); Tenn. Code Ann. § 40-35-113(8). We find no error in the trial court's refusal to apply mitigating factors (2), (3), (8), and (12).

The appellant also challenges the trial court's failure to find that the appellant played a minor role in the offense. Tenn. Code Ann. § 40-35-113(4). The appellant argues that "the jury verdict, ipso facto, proved that her role in the commission of [the] murder was minor." However, the appellant was convicted of facilitation of murder, not murder. Based upon the facts and circumstances surrounding the offense, we agree with the trial court's finding that the appellant's role was not minor. Accordingly, we conclude that mitigating factor (4) was inapplicable.

The appellant appears to assert that the trial court should have applied mitigating factor (9). However, the only argument offered on appeal is that "[i]n all honesty, appellant's counsel does not know, from the [trial court's] comments, whether this factor was considered." In sentencing the appellant, the trial court stated, "I find there are no mitigating factors that should apply in the [appellant's] case." However, we agree that the trial court's findings regarding mitigating factor (9) are unclear. Regardless, on appeal, the appellant offers no argument in support of the application of this factor. See Tenn. R. App. P. 27(a)(7). Therefore, the issue is waived. Tenn. Ct. Crim. App. R. 10(b).

Next, the appellant contends that the trial court erred by failing to apply mitigating factor (11), i.e., "[the appellant], although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." Tenn. Code Ann. § 40-35-113(11). The trial court noted that although it was doubtful that the appellant "ha[d] a continuing intent to kill people . . . or to facilitate in killing people," the appellant's criminal history prevented the application of mitigating factor (11). In certain cases, an appellant's criminal history may be relevant in determining whether a sustained an intent to violate the law motivated criminal conduct. State v. Lee Roy Gass, No. E2000-00810-CCA-R3-CD, 2001 WL 767011, at *17 (Tenn. Crim. App. at Knoxville, July 3, 2001). Regardless, as previously noted, the evidence at trial established that the appellant knew that Kermit intended to kill the victim, yet she ignored numerous opportunities to remove herself from the situation or seek help from others. Moreover, she encouraged Kermit to murder the victim by telling him to "do it" and then held a knife to the victim's slit throat. Thereafter, she participated in concealing the crime. We conclude that the evidence does not support the application of mitigating factor (11).

Finally, the appellant asserts that the trial court erred by not applying "any other factor consistent with the purposes of this chapter." Tenn. Code Ann. § 40-35-113(13). However, the appellant failed to specify which factors the trial court should have applied under this "catch-all." At the sentencing hearing, the trial court declined to apply mitigating factor (13) that the appellant expressed remorse for her crime or that she was the mother of two small children. We conclude that,

even if the appellant were entitled to mitigation based upon these factors, it would not lead to a reduction in the appellant's sentence.

Based upon the application of enhancement factors (2), (6), and (10), and the lack of mitigating factors, we conclude that the trial court did not err in imposing the appellant's twenty-five year sentence.

### C. Classification of Facilitation of First Degree Murder

We note that the judgment of conviction incorrectly reflects that the appellant was convicted of facilitation of premeditated murder, a Class B felony. Premeditated murder is first degree murder, which is classified as one class above a Class A felony. Tenn. Code Ann. §§ 39-11-117(a)(1), 39-13-202(a)(1). The appellant was convicted of the lesser-included offense of facilitation, which is to be classified as "an offense of the class next below the felony facilitated by the person so charged." Tenn. Code Ann. § 39-11-403(b). Accordingly, the judgment of conviction should have reflected that the appellant was convicted of facilitation of premeditated murder, *a Class A felony*. We remand for the correction of the judgment of conviction to reflect the correct felony classification. See State v. Julius L. Jones, No. W2002-02336-CCA-R3-CD, 2003 WL 23100729, at *3 (Tenn. Crim. App. at Jackson, Dec. 30, 2003).

### III.  Conclusion

We remand to the trial court for the correction of the judgment of conviction to reflect the correct felony classification of facilitation of first degree premeditated murder, a Class A felony. The judgment of the trial court is affirmed in all other respects.

_____
NORMA McGEE OGLE, JUDGE